BERNARD S. ARMOUR, petitioner-respondent,

*v.*

MARTHA S. ARMOUR, defendant-appellant.

[Argued February 11th, 1946. Decided May 3d, 1946.]

*Mr. Charles Hershenstein* and *Mr. Richard J. Fitz Maurice,* for the petitioner-respondent.

*Mr. George W. C. McCarter, Mr. John E. Toolan,, Mr. Meyer E. Ruback, Mr. Joseph A. Weisman* and *Messrs. McCarter, English & Studer,* for the defendant-appellant.

The opinion of the court was delivered by

CASE, CHIEF-JUSTICE.

Other phases of the litigation between the parties are reported in *131 N. J. Eq. 110; 132 N. J. Eq. 298,* and *135 N. J. Eq. 47.*

This is an appeal by Mrs. Armour from a decree *nisi* against her for divorce on the ground of adultery and from the order fixing counsel fees (including disbursements) to

defendant's counsel at $10,000. Numerous acts are charged in the petition and three corespondents are named, Nathan Berger, Robert C. Ellis and Dr. Benjamin Kramer. Misconduct is alleged to have occurred with these men during the periods from August 23d, 1941, to October, 1941, from October 20th, 1941, to February 17th, 1942, and from May 15th, 1942, to November 6th, 1942, respectively. The decree finds that "the defendant has been guilty of the adultery charged against her in said petition." There is not testimony to sustain all of the charges, but there is testimony which, if believed, would sustain some of them; nevertheless, weighing the case as a whole we are not satisfied that the husband's proofs carry the burden of the wife's guilt. We shall not make reference to, much less a critical analysis of. the testimony of all of the nearly ninety witnesses or the proofs contained in all of the 140 exhibits; but we shall endeavor to give enough detail to point the reasons for our conclusions.

As to the alleged Berger offenses: The charges seriously supported are laid at a cottage connected with the Hollywood Hotel, West End, where Mrs. Armour, with her children, was spending a part of the late summer of 1941. Mrs. Armour testified that her husband told her she was to go to that particular hotel or nowhere; an assertion which the husband denies; wherefore the incident, with its implications of an entrapment planned by the husband, is left for the moment in equipoise. For a part of the time Nathan Berger was there also, and he and Mrs. Armour met and on occasions were together. The most damaging proof of guilt comes from the witness Samuel Lassman. Lassman and Berger were there together; they were there for the purpose of showing and selling furs. They were and are partners in the fur business. That Lassman should come forward with evidence involving his friend and business associate in a clandestine and adulterous act and should still further, entirely without support, attempt to involve him and Mrs. Armour at a meeting in Berger's room at the Hotel Clinton in New York City is provocative of thought. It was developed by the defense that Lassman had, on February 19th, 1937, been convicted in the Court of General Sessions of the State of New York of grand

larceny in the second degree, and that on March 9th, 1937, he had been sentenced on that conviction to imprisonment in the penitentiary of the County of New York. In addition to this cloud upon Lassman's veracity, there was a further incident to which we attach high significance.

In November of 1942, a little more than a year after the Hollywood Hotel affair, Berger, the alleged paramour, asked Mrs. Armour to make an appointment with him in New York City. Mrs. Armour communicated with her then solicitor, Mr. Ralph E. Lum, who was representing her in the Chancery proceeding against her husband for separate maintenance. Lum advised that it was proper for her to make the character of appointment that was proposed. Berger met Mrs. Armour with his automobile, presumably to take her to some public eating place for dinner. What he did was to drive to a business building in which he had offices and invite her to go upstairs with him. She refused and waited in the automobile. Berger went upstairs alone and presently came out with a group of men, of whom the above named Lassman was one and Sigmund Thiel, a brother-in-law of Armour, was another. The group, or some of them, thrust themselves into the automobile, took flashlight photographs of Mrs. Armour and in so doing tore some of her clothing and generally acted monstrously towards her. That is Mrs. Armour's testimony.

Mrs. Armour forthwith, on the night of the event, reported the experience by telephone to Mr. Lum who, the next day, went, unsuccessfully, before the Chancellor with a verified petition setting forth the incident and praying that Armour be held in contempt in the suit then pending. The incident so far as it concerned Mr. Lum was related by him on the witness stand, and we accept his testimony unqualifiedly. The present divorce suit was not instituted until May 1st, 1944. No matter had come to Mrs. Armour's attention to put her on notice that her husband was proposing to bring a divorce action or that he proposed to allege occurrences with Berger at the Hollywood Hotel or that he was aware that there were such occurrences.

Armour testified that he knew nothing about the matter, but he may not so lightly brush away the searching implica-

tions of the charge. Lassman was not called upon to contradict the statement and Armour's brother-in-law, Thiel, was not put upon the stand. The proof, left in that shape, leads us to the conclusion that Berger, the alleged paramour, and Lassman, the chief witness as to the Berger incidents, were in an active conspiracy with persons close to and working in behalf of the husband to ensnare Mrs. Armour or to manufacture fictitious proof against her. The contention that there was a burden upon Mrs. Armour to call Berger as a witness is, under the circumstances, without force. Our confidence in so much of the petitioner's case as involves Berger is greatly shaken. Having thus appraised the Berger incidents, we approach the remaining charges with caution.

As to Robert C. Ellis: On this phase of the case the chief witnesses for the petitioner are Dominic Caso, Caso's wife and Ellis himself. Caso was a retired detective of the New York police department. After his retirement he undertook for a time to operate a private detective agency. Then, about the month of February, 1941, he entered the employ of Armour's company, the American Aniline Company. About the middle of September of that year he was given Mrs. Armour's photograph, her name, address and automobile number and was told to investigate her and see what he could find out. His wife worked with him in that effort. We consider that the Casos come within the classification of paid detectives and, therefore, under the rule that although their evidence is competent it is to be received with caution and scrupulously and minutely scrutinized. *Bemis* v. *Bemis, 114 N. J. Eq. 53.* Caso in more than one instance manifested a willingness to say what the occasion seemed to call for. He testified in great detail of the happenings of different days. He tells, for instance, of driving to Mrs. Armour's house about 9:15 in the morning of March 7th, 1942, to watch for her. Presently he drove to the Pennsylvania Station in Newark and there parked his car. Shortly after one o'clock he saw Mrs. Armour get on a Pennsylvania train for New York City. Caso left his car parked at the Pennsylvania station in Newark and took the same train. Mrs. Armour alighted at the Pennsylvania station on Seventh Avenue in New York

City and took a cab to Tenth Street and Sixth Avenue. Caso, following, did the same. He saw Mrs. Armour meet Ellis and tells of their going to the Longchamps bar and the Charles' restaurant and the like. He must have spent two or three hours in the neighborhood, and his method of observation was: "I parked my car on the west side of Fifth Avenue and I saw from the window." His story was wrong somewhere. His car could not have been parked at Newark and in New York at the same time. We shall presently express further doubt about his strict adherence to the truth.

It is difficult from the informal announcement of conclusions made by the advisory master to determine precisely the occasions to which the findings of guilt relate. One of the charges in the petition goes to October 24th, 1941. The evidence of Mr. and Mrs. Caso as to that day is fairly typical of their observations in general, and we shall relate it in some detail. According to their testimony Ellis entered Mrs. Armour's home at six o'clock in the evening and came out with her fifteen minutes later; the couple drove to New York and entered Charles' restaurant on Sixth Avenue at eight o'clock from which they came out at ten o'clock, entered the automobile and on Sixth Avenue loved and embraced and kissed each other for a period of about a half-hour; they then drove down to Whitehall Street near Battery Park, the hour being then eleven; they sat in the car and kissed for about forty minutes; they then left the car and walked to the back of the Aquarium where the detectives lost sight of them for an hour; the couple then returned to the automobile and kissed; they then went to Child's restaurant where they stayed twenty minutes, came out and kissed; from there they drove to South Orange; at a point about three blocks from Mrs. Armour's house they kissed again, a few minutes later they drove to Mrs. Armour's home where Ellis got out, escorted Mrs. Armour to the door, came back and got into his car and drove off. We do not find persuasive evidence of adultery in that testimony. Mrs. Armour and Ellis appear to have been observed by the detectives at all times except when they were out of the car at Battery Park. There, for an hour, they were not within the vision of the detectives.

We think that the unobserved presence of the couple in the spaces of Battery Park does not call for the inference of an adulterous act.

Mrs. Armour did not call Ellis as a witness. She gave as her reason that she had cause to believe that he had been in contact with her husband. And in that belief she was substantially right. Prior to the trial Ellis had had several conferences with Caso. He had had several conferences with Mr. Maurice Hotchner, a New York attorney who had charge of assembling the proofs in the case on behalf of petitioner, and who is mentioned elsewhere herein. He had gone voluntarily to Hotchner's office and had answered Hotchner's questions to the extent that he gave Hotchner the information which Ellis related in court when he was summoned there as a witness by the husband. Petitioner's counsel, in examining Ellis in court, did not deny the remark then made by opposing counsel that he was examining from a prepared statement. Ellis' testimony was a contradiction of Mrs. Armour in some respects. She said that he had not kissed her. He said that he had. She said that he had never called at her home. He said that he had. But he emphatically denied that he had ever committed adultery with her. Respondent seeks to benefit by so much of the witness' testimony as is favorable, or at least not harmful, to his case, but would reject such portions as deny adultery. We recognize fully that the testimony of a corespondent should be carefully scrutinized, particularly in respects which affect his guilt. But the witness was not put on the stand in his own behalf, or in behalf of the defendant. He was placed there after a certain amount of co-operation, the extent of which we do not know, between him and the petitioner's attorney, and with the knowledge on the part of the petitioner's examining counsel of what he would say. We do not find that the testimony of the Casos, or the other parts of Ellis' testimony, or such testimony as there is from other persons, point so irresistibly toward guilt as to cause us to reject, absolutely, the testimony of the witness against it.

As to Dr. Benjamin Kramer: The master found guilt on the part of the defendant and Dr. Kramer, who was a Brook-

lyn physician specializing in children's diseases. Dr. Kramer brought all of the Armour children into the world and attended all of them in their major ailments. Until the present differences arose he was a friend of both Mr. and Mrs. Armour. Guilt was found both at the defendant's home in South Orange and in the Glickman apartment, 415 Central Park West, New York City. The proof is stronger as to the latter address, and we shall discuss it only.

The building is a double apartment house of seventeen stories with a penthouse; it has eighty-three apartments and is served by four elevators. The building is a busy one; many people come and go, and the service men have their time and attention occupied accordingly. Guilt was charged on August 8th, 1942, on August 9th, 1942, and on "numerous occasions"—unspecified—"during the months of August, 1942, and September, 1942." Mrs. Glickman was a friend of Mrs. Armour. Mrs. Glickman and her husband, together with a Miss Peck and occasional subtenants, occupied an apartment of seven rooms on the third floor. The Glickmans lived there for about two years until the middle of September, 1942. A young married couple named Goloboff were occupants of a portion of the apartment from July 25th, 1942, until the latter part of September of that year. The Glickmans were away for most of the month of August. Petitioner's proof is solely circumstantial and consists mainly of the testimony of four men, of whom two were doormen and two were elevator operators at the apartment house. These men had no convincing reason to mark the presence or the comings and goings of either Mrs. Armour or Dr. Kramer, had the recounted events actually transpired. Their stories, severally, run to a form. They talked with Caso in January of 1943; so they say. But the conceded fact seems to be that they gave no recital of their alleged observations to anyone until the summer or fall of 1943 when they were induced by Caso to call at attorney Hotchner's office. What they tell as the things they remember are rather surprising in detail when compared with the things they forget but which, by the same standard of memory, they should recollect. They remember dates and hours, even minutes. One of the

doormen recollected that the couple had been there a dozen times during the summer, and he appeared to have no difficulty, after the long passage of time, in remembering that on the first occasion they arrived in a taxi, that on their next arrival they came in a car with a New Jersey license and that on the third occasion they came in a car with a New York license and an "M. D." plate. They remember the size and color of the handbag which Mrs. Armour carried. But they have no recollection of the correct facts, as we find them, about the occupancy by the Goloboffs of the apartment and their going to and from it constantly through the summer from late July until sometime in September. The period of the Goloboff occupancy is the season when, according to the named witnesses, many of the love trysts were had. When asked to give the same character of information about other apartments in the building as one of these witnesses had essayed to give about the Glickman apartment during the afternoon of a late July day the witness answered: "There is eighty-three apartments in that building and if I was able to verify everyone that was out that day I wouldn't have to run an elevator to-day. I would have a good head."—Which is very much the way it seems to us.

Mr. and Mrs. Glickman testified that they did not know Dr. Kramer; that Mrs. Armour had never come with a man to their apartment and that they had never given a key to the apartment either to her or to the man whose photograph was proved to be that of Dr. Kramer; that Mrs. Armour did not occupy the apartment during the summer of 1942; that the Glickmans were at the apartment until August 2d, then away until August 19th, there until August 22d, then away until early in September; that they moved from the apartment on September 12th; that before their first departure Mr. and Mrs. Goloboff had come in as subtenants of a room with privileges in other portions of the apartment; that Miss Peck, who had recently married a Mr. Smith, was a co-tenant. The Goloboffs testified to their occupancy of a portion of the apartment from their wedding day, July 25th, 1942, to the end of September and to daily use of the premises; that Mrs. Goloboff did the cooking for the couple and

for that purpose used the kitchen in common with the Glickmans' maid; that they had never seen Dr. Kramer—the photographic exhibits being used for identification—and that they had never seen Mrs. Armour until they had conferred with her in the preparation for the present trial, about two weeks before the day of the hearing. Mrs. Purcelle Peck Smith (the Miss Peck referred to above) testified that the lease to the apartment was actually in her name and that the various people who occupied parts of the apartment lived much as one family, using the rooms freely; that the kitchen and dining room were used in common by all; that the witness was a college graduate holding a degree from the University of Wisconsin and was a magazine editorial writer; that she had been married in the apartment on April 2d, 1942, by her father, a minister of the Methodist Episcopal Church of Springfield, Illinois; that on June 22d, 1942, she submitted to a major operation and returned to the apartment about July 5th, remained there for three or four days and was then, with her husband, in Cleveland, Ohio, during the remainder of July; that she returned to her apartment August 1st or 2d, at which time she found, as she was aware she would find, the Goloboffs as part tenants; that from that time until the apartment was vacated in September she was at the apartment day and night with the exception of working hours (mornings only during the first week) and a two-day "week-end" in early September; that, she had met Mrs. Armour at a party held at the apartment in the winter of 1940-1941 but had no recollection of having seen her there again; that she did not know Dr. Kramer and had never seen the man. Other witnesses contributed their portions.

The testimony given by the four apartment house employees is in too great conflict with the defendant's proofs for both sides of the story to be true or for both sides to have been told with truthful intent. The defendant's witnesses both in number and quality prevail; and their oral testimony is buttressed by convincing documentary proof.

In our opinion the petitioner failed to carry the burden of proof with regard to the Dr. Kramer charges, and he failed also with respect to the Berger and the Ellis charges.

Counsel for the appellant allege that their client was not accorded a fair trial by the court below. They particularize this ground of appeal by enumerating a half-dozen classes of complaints of which the foremost are that the master invoked an unfavorable inference against the defendant because she had not called the Glickmans' maid, Mrs. Florence C. Gates, as a witness and that the master permitted, indeed caused, that person to be called as a witness on the Kramer charges at the end of the case; that on the Berger charges the master allowed Lassman, near the end of the case, to testify on matters that should properly have been heard only on petitioner's main case and that he did the same with Ellis in respect of the Ellis charges.

As we have said, Mr. and Mrs. Glickman were tenants of the apartment at 415 Central Park West, where most of the acts with Dr. Kramer are said to have occurred. Mrs. Glickman had mentioned, in her testimony, that she had a colored maid, a married woman named Florence Gates. When the defense finally reached their last half day of testimony and had announced that they would finish that afternoon, the master asked Mr. McCarter if he proposed to produce the maid, Florence Gates, and was informed that he did not, whereupon the master announced that he would cause the woman to be subpœnaed as a court witness. Mrs. Gates was thereupon subpœnaed. The outcome weighed so heavily in the findings of the master against the defendant that we feel obliged to discuss the subject at length.

Gates appeared and was briefly examined in chief by the court; she was cross-examined with extreme brevity by the defense; and she was cross-examined at great length by the petitioner. Her testimony in answer to the master's questions disclosed that she did not know Mrs. Armour at the time in question and had not known her until approximately two months before the time of testifying; and that she did not know Dr. Kramer and had never seen a man resembling his photographs. On the foundation of that testimony the petitioner confronted her with long typewritten statements purportedly signed and sworn to by her at the office of petition's attorney, Hotchner. The statements alleged that Mrs.

Armour and Dr. Kramer had been together at the Glickman apartment about fifteen times, that under instructions from Mrs. Glickman the witness always gave Mrs. Armour the guest room and that the two (Mrs. Armour and Kramer) were seen by her in compromising positions and usually were still there when the maid left at eighty-thirty or nine o'clock in the evening. There were three such statements admitted in evidence, one purporting to have been signed and sworn to on January 26th, 1943, the second on January 30th, 1943, and the third on February 9th, 1943; and the master in admitting them refused to limit their evidential effect.

Gates denied the truthfulness of the allegations and denied signing the papers. She probably did sign them. Whether she knew all of the contents is not certain, notwithstanding proof that she read them. Hotchner, the lawyer, who talked with the witness and dictated the statements did not testify, although he was present each day of the hearing, at least until November 27th, in the midst of defendant's case. When pressed on the examination by petitioner's counsel, the witness broke down and tearfully stated that she had repeatedly been goaded to make the statements by detectives who had come to her many times and made offers of money ranging from $10 to $50, and she specifically named a detective named Wittenberg—"A couple of times he left $10 and said 'Take it for your mother.'—One day he gave my little boy a dollar" —and "two big negro men" who said "they had $50 waiting at 125th Street" for her. Caso, the detective, later testified that he had been to the woman's house a few times but had offered no money, that although he knew her little boy he had not given him a dollar and further that he had no "expense account;" and at first he said that he did not know anybody by the name of Wittenberg but on further questioning he said that "There are a lot of detectives by that name still on the police department." Michael Farley was one of the elevator men at 415 Central Park West who testified for the petitioner. He said that the first time he had been spoken to by anybody about Dr. Kramer and Mrs. Armour was "about January" of 1943 when he was called upon by Caso, but he didn't tell Caso "much of anything;"

that he visited Hotchner's office "around July or so, 1943," but did not then "open up;" and that later Caso "came and persuaded" him to go again to see Hotchner and that there was when he told his story; and that although the visits did not deprive him of the regular wages of his employment he was each time paid $10 "and expenses." Someone not far removed from Caso must have had an expense account.

That the name of Wittenberg was not a fiction emanating from the perturbed mind of Florence Gates and that there was a man of that name active in the case came from the lips of other witnesses. Hyman Glickman testified he had been interviewed by an investigator who called himself Mr. Brown but whose true name, as the witness later learned, was Wittenberg and who offered the witness something (the witness was not permitted by the master to say what) if he would sign a statement with indicated contents. Wittenberg is definitely and convincingly fixed in the testimony of Purcelle Peck Smith as associated with the investigators employed by the petitioner. Mrs. Smith testified that while she was in Cleveland after finally leaving New York two men came together to question her about the Dr. Kramer incidents. One gave the name of Wittenberg; the other gave his name as Sherman but was identified by Mrs. Smith from the witness stand as petitioner's New York attorney, Mr. Maurice Hotchner, who was sitting in the court room at the time the witness was testifying. Mr. Hotchner did not take the stand or otherwise question the correctness of the identification.

The fair implication in Caso's testimony is that he was not aware of the existence of an operator going under the name of Wittenberg and working for the petitioner in this case. Having in mind the intimate relations between Caso and Hotchner and Caso's familiarity with the case and his important place in the investigation, we conclude that Caso did not tell the truth. We further conclude that Gates did tell the truth when she named Wittenberg, an investigator for the petitioner, as one who had persistently urged her toward the making of the statements. It is unfortunate that matters of slight importance in themselves should require so much expenditure of time and remark, but only by such

indicia may the veracity of the witnesses be deduced from the printed page.

What was the inducement which brought Florence Gates three times to the office of a strange attorney, once to make and twice to amplify a sworn statement which involved her mistress in housing an illicit amour? Simply a restless desire to tell and expand upon the truth? The untruthful disclaimer of Wittenberg, the silence of the man who talked with Gates and undertook to commit her words to paper and the incident of Mr. Michael Farley suggest that the charges made by Gates on the witness stand had some element of substance.

The master, in summoning the woman as a court witness, acted upon what he considered were precedents in the cases of *Atha* v. *Atha, 94 N. J. Eq. 692; affirmed, 95 N. J. Eq. 275,* and *Grant* v. *Grant, 84 N. J. Eq. 81.* Neither of those cases is in point. The opinion in the latter case quoted this passage from *2 Bish. Mar., Div. & Sep. 663:*

"The public, which we have seen to be a party in all divorce suits, occupies a unique position, sometimes embarrassing to the court. It does not ordinarily appear by counsel, and when without counsel does not plead. As against this party, when only thus represented by what is called the conscience of the court, the plaintiff is entitled to the decree on his case being duly and fully proved. But this party, unlike the others, never loses a right by *laches;* and so, whenever a defense comes out in the evidence, whether alleged or not, it is fatal to the proceeding. A maxim in these suits, therefore, is, that a cause is never concluded as against the judge; and the court may, and to satisfy its conscience sometimes does, of its own motion, go into the investigation of facts not contested by pleadings."

All of which may be accepted as correctly stated without touching the instant case. The interest of the public in a divorce proceeding, as distinguished from its interest in having every case rightly decided, is that the marriage relationship and the union of the family shall be surrounded by every safeguard and not ended except in the manner prescribed and for the causes specified by law. This was not a suit in

which the parties were consenting or in which they failed to contest the facts. The fight was bitter and absolute to the point of exhaustion. There was no foundation for belief that Mrs. Armour was not producing all evidence within her reach to forestall a divorce decree.

Of course the exhibits thus brought into the case are not proof of guilt and may not be so considered; but they and the entire incident were given a weight that was undeservedly harmful to the defendant's case. The damage done to the defendant by the production—for which the defendant was in no degree responsible—of this witness may be gauged by the comments of the master in his letter of conclusions:

"I have attached considerable importance, in arriving at [my] conclusion, to the fact that Florence Gates, the Glickman maid, was not produced by defendant. Defendant's proof established the fact that this maid was in the Glickman apartment on practically every occasion when defendant and Dr. Kramer are charged with having committed adultery there. Obviously, had this witness been produced by defendant and had she testified truthfully, she could have supplied the complete solution to this particular charge. The fact that she was brought in as the court's witness and that she virtually collapsed while undergoing reasonable cross-examination indicates that she was conscience stricken; that she withheld testifying to the truth because she had been tampered with by defendant or sources close to the latter."

We have no desire to impose restraint upon the reasonable exercise of discretion by the trial court in the conduct of divorce actions, nor do we hold that under no circumstances may the court summon a witness. But we find no reasonable justification for that course or for the ensuing condemnation of the defendant in this case. The defendant was not under obligation to call Gates. If the petitioner had confidence in the authenticity of the statements, the natural course would have been for him to call the witness; and he was not asked, before the court injected its own direction, whether he proposed to do so. But if the petitioner entertained doubts about them and therefore did not wish to make the witness his own, and was disappointed in not having the opportunity

of using them to the undoing of Gates as a witness for the defendant, his advantage lay in the procedure that actually was followed. He was enabled to bring his proofs to the court's attention out of their chronological order and without assuming responsibility for the witness' veracity; and the abundant fruitfulness to him of that course is manifested by the master's findings, *supra*. The court's purpose was to obtain the truth and thus to achieve justice. However, the result illustrates the need for extreme caution by a court in the exercise of a discretionary function to call a witness, lest one party be given an unfair advantage over the other by reason of some phase of trial technique; a caution so meticulously observed by our trial judges that no like instance in our decided cases has come to our attention. The petitioner had as much reason and as much opportunity to bring Gates into court as did the defendant. The subpœna which finally summoned her was attested with the signature of petitioner's New York attorney (the session was in New York), was served under his direction and certified that she was called on the part of the petitioner. We know of no sound reason why the *onus* of the incident should be laid upon the defense.

The order of proof in civil cases is largely at the discretion of the court. The general rule, together with a realistic hint of the motives that sometimes actuated lawyers of 125 years ago to secure a variation from that order—and of the alertness of the court to such motives—was given by Chief-Justice Ewing in *Den* v. *Geiger, 9 N. J. Law* *225, 238:*

"A plaintiff should in the first place and before he rests, examine all his witnesses and to all his points, except such witnesses and such points as are made proper by the defendant's evidence and defense. The evidence to be given on the part of the plaintiff after the defendant has been heard, should be confined to rebutting evidence. It is not proper to give just so much evidence as may save a nonsuit, and bring in a *corps de reserve* toward the close. Neither convenience, nor economy of time, nor candor of practice will permit. To bring out the defendant, as one of the plaintiff's counsel expressed himself, cannot be countenanced. In this warfare

nothing is admitted but fair, open and honorable combat. No feints, no stratagems, no ambuscades."

Where either party has accidentally overlooked or omitted material evidence, or there is other good reason, it is usual and proper, in the discretion of the court, to permit the omission to be supplied, even if the adverse party has rested. But the fact remains that through the centuries a certain order for the producing of proofs had been adopted as the best means of reaching a fair and expeditious conclusion of disputes. That order should be the procedure except where, in the discretion of the trial judge, there is adequate reason for variation, and when there is a variation it should be recognized as such and not as the normal procedure. The calling of the witness Lassman late in the case was done without good reason appearing in the record; he was in court during a part of petitioner's main case; but, while we direct attention to the desirability of holding to the orderly procedure, we are not disposed to make a finding of error thereon.

Armour was imperious, unsympathetic and morbidly suspicious in his attitude towards his wife. He saw evil in every shadow. He first tried to force her into a mould of his own making, and failing in that he used his position, his wealth and his other resources to wear her down and then relentlessly to crush her. On the other hand, Mrs. Armour was spirited, pleasure loving, frivolous, foolish and indiscreet. The pair were tragically mismated. The wife had realized that their personalities, their manners and their views of life were irreconcilable. She had earlier urged her husband to consider the question of divorce upon other grounds—this from his own testimony. He said, "She kept hounding me constantly for a divorce," and "I told her there would be no divorce under any circumstances." No divorce; yet, knowing his wife's wretchedly unhappy existence and her love of gayety and life he waited and watched and ferreted, for years, to the end that he might bring this case against her, the mother of his children.

The petition charges adultery over the period from August, 1941, to November, 1942, with three men; not a few acts, but many; in fact unnumbered. It charges the commission

of the act in defendant's home, in hotels, in the houses of friends; on the public grounds of the parks of New York City and of the City of Orange; in automobiles—the defendant's own and those of her paramours—while the automobiles were variously located in the driveway of the defendant's residence, on hotel grounds, on country roads and on city streets. One wonders whether a woman could be so much of an unmoral animal and still preserve a reputation for decent living. That a mature woman, the mother of children, with an established place in society, should hold her body so cheaply denotes a fundamental fault in character which it would seem could hardly be concealed from those who knew her well. Yet, for what it is worth, almost a score of highly respectable people attest the defendant's reputation for chastity and their esteem of her manner of living—Jewish rabbis, friends, neighbors, co-workers in local institutions and community undertakings.

We are not persuaded that the defendant committed the acts of adultery charged against her.

Finally, as to the allowances. There was an initial allowance to Messrs. McCarter, English & Egner, later McCarter, English & Studer, in the amount of $1,500. The final allowance was of $10,000 to be paid to the defendant's solicitors, the same to cover their disbursements as well as their compensation. The actual disbursements amounted to $1,665.66. The net allowance for services was, therefore, a little less than $10,000. Of the McCarter firm the only member who participated actively in the preparation for and in the conduct of the hearings was Mr. George W. C. McCarter. He found it impossible to perform all of the labors himself and called to his assistance two other counselors-at law, Mr. Meyer E. Ruback and Mr. Joseph A. Weisman. Adding their respective days of service, these men devoted about 300 days to the preparation for and the trial of the defendant's case. We think that the advisory master was sound in making the allowance solely to the solicitors of record rather than directly to the several lawyers who were recorded in the stenographer's notes as appearing at the hearings. But among the elements to be considered in fixing the allowance are the professional

services rendered, not only by that firm or any of its members, but by other lawyers at their behest. The amount named in the order under appeal would have been sufficient if, as was then the finding, the wife had committed the offenses charged, because in that case her position would have been that of a guilty party seeking to present a false defense. Her status now is that of a wife who sought to defend her most treasured rights and privileges against all the resources that a wealthy and influential husband could marshal against her; a status that has been attained because of the faithful, prolonged and skillful services of her lawyers. Having regard for the professional standing of counsel, the absorbing demands of this protracted case, the services of collaborators who must be paid and the obvious capacity of the petitioner to make reasonable compensation, we think that the allowance should be increased from $10,000 to $25,000.

We find it unnecessary to deal with other questions presented on appellant's brief.

The record will be remanded to the Court of Chancery to the end that the decree *nisi* be reversed, the petition be dismissed and an order for allowances be made in accordance herewith; costs to the defendant.

Addendum:

The case was closed January 17th, 1945. Thereafter doubtless some time was allocated to the arguments and briefs of counsel. On August 8th, 1945, the advisory master wrote a lengthy letter to counsel informing them of his conclusions. On August 28th, 1945, the decree *nisi* was signed. On October 4th, 1945, the notice of appeal was served. On November 15th, 1945, the petition of appeal was filed. On February 11th, 1946, the appeal was argued orally before the Court of Errors and Appeals and all papers were submitted. On March 21st, 1946, the court, after studying the case, conferred thereon and assigned the writing of opinion. On April 11th, 1946, after all of the foregoing events had transpired, the advisory master filed in Chancery his formal conclusions

which, in the printing, make up a volume of 130 printed pages. That volume was circulated among the members of the court after this opinion had been drafted. Counsel for appellant object to the submission at this late day when there is no opportunity to comment or criticise. The mere statement of sequences shows the irregularity of the procedure. We have read the conclusions but find no necessity for changing our opinion. Therefore, it becomes unnecessary to rule upon appellant's objection.

No. 215 (with 218)—

*For affirmance*—None.

*For modification*—THE CHIEF-JUSTICE, PARKER, BODINE, DONGES, HEHER, PERSKIE, OLIPHANT, WELLS, RAFFERTY, DILL, McGEEHAN, JJ. 11.

No. 218 (with 215)—

*For affirmance*—DILL, J. 1.

*For reversal*—THE CHIEF-JUSTICE, PARKER, BODINE, DONGES, HEHER, PERSKIE, OLIPHANT, WELLS, RAFFERTY, McGEEHAN, JJ. 10.