97 N.J. Super. 446 (1967)
235 A.2d 240
ROSE DEL PRESTO, PLAINTIFF-APPELLANT,
v.
ANTHONY DEL PRESTO, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 1967.
Remanded April 11, 1967.
Decided November 9, 1967.
*447 Before Judges LEWIS, LABRECQUE and LEONARD.
Mr. Herman E. Dultz argued the cause for appellant.
Mr. Harold M. Savage argued the cause for respondent.
*448 The opinion of the court was delivered by LEWIS, J.A.D.
In this suit by plaintiff wife for separate maintenance and incidental relief, the trial court, on motion of the defendant husband, suppressed certain evidence asserted to have been illegally obtained in violation of the Fourth Amendment to the United States Constitution. We granted plaintiff leave to appeal.
Involved are the evidentiary fruits of two searches: (a) a nighttime "raid" by plaintiff and her private detectives on the apartment of defendant's alleged paramour, and (b) plaintiff's search of defendant's alleged "private" business office and files. The opinion of the trial court, as reported in 92 N.J. Super. 305 (Ch. Div. 1966), dealt with the evidence secured in the raid. In an unpublished letter opinion the attorneys for the parties were advised by the trial court that it would suppress "all evidence secured by the plaintiff without legal right of the defendant," but that the opinion would deal only with the raid because "the same law applies to the illegally possessed personal property as applies to the evidence ascertained in the raid."
The trial judge reached his determination based on the moving papers, supporting affidavits and the arguments of counsel. No testimony was taken and the court made no findings of fact. The issues raised on appeal are manifold and of constitutional import.
After oral argument we concluded that the record was so inadequate that we could not "rationally evaluate the underpinning of the trial court's conclusion," and thus we could not "fairly assess the relative merits of the basic contentions urged by the litigating parties." Accordingly, we remanded the matter to the trial court for specific findings of fact with respect to several enumerated questions.
The facts as developed on the remand are in substance as follows: The parties were married February 29, 1948. Shortly thereafter defendant became a licensed mortician of the State of New Jersey and entered into the business of conducting funerals. In 1955 he opened his current funeral *449 parlor at 185 Clifton Avenue, Newark, in a building owned by the litigants as tenants by the entirety. The structure consists of a basement and first floor devoted wholly to business use, and separate living quarters on the second floor which were "very infrequently" used for conducting funerals. Also on the second floor is an office wherein the records of the business are kept in three file cabinets.
The trial court specifically found that "the office and the files therein were not ordinarily kept under lock and key and * * * that plaintiff as a wife and helper in the business had access to the office and files in performance of duties she undertook or was asked by defendant to undertake." On cross-examination defendant admitted that some of his wife's dresses and other personal effects were, at the time of her alleged "search" of the files, located in a closet in the office.
Plaintiff claims a partnership interest in the funeral business. Although the trial judge found that she had, from May 11, 1955 to June 14, 1965, a power of attorney as to the checking account and did some work in connection with the enterprise, he concluded that "the funeral parlor business at that address [185 Clifton Avenue] was never operated by plaintiff and defendant as partners."
Sometime in late 1964 or early 1965 plaintiff became aware of the fact that her husband was involved in what she suspected was an adulterous affair with a paramour. This information was apparently obtained by eavesdropping on telephone conversations between defendant and his girl friend. It was found by the trial court that, as the result of listening in on one of these telephone calls, plaintiff learned about the existence of the papers she later obtained from one of the file cabinets in the office. These included love letters and Christmas cards sent by the paramour to defendant, a pamphlet on oral contraceptives and pregnancy, and a receipt for an item of jewelry not given to plaintiff.
The Chancery Division further found that "plaintiff did not have to make forcible entry into either the office or files *450 to secure the suppressed evidence." Also, "plaintiff did not have to, and did not make use of a key or keys to secure the suppressed evidence." It should be noted that then, and even at the time of trial, both husband and wife resided at the Clifton Avenue premises.
In late January 1965 plaintiff hired the Lynn Detective Bureau of South Orange, New Jersey, a private detective agency, to conduct an investigation of her husband's extramarital relationship. The head of the bureau, one DeLorenzo, testified that plaintiff insisted upon a raid of the girlfriend's living quarters. Accordingly, the detectives rented an apartment in the same building and kept the parties under close surveillance.
On the night of March 4, 1965 defendant and the paramour went out, leaving the latter's six-year-old son home with a babysitter, a neighbor. They returned shortly after midnight and the babysitter left. At about 1 A.M., in response to a call from the private detectives, plaintiff arrived at the apartment building. What subsequently transpired is not altogether clear. It appears, however, that the detectives decided to enter the paramour's apartment and assaulted the door with their shoulders and feet. The door did not open, but it was bent both above and below the knob and lock. A tire iron was then applied to the area around the lock, but to no avail.
Relying heavily on the police "captain's report," submitted by patrolman George Sevilis at 3:15 A.M. on March 5, the trial judge made findings of fact:
"* * * that the police were summoned by a telephone call at 1:18 A.M. from * * * the tenant [paramour] in the apartment; that she told the police in the telephone call that some persons were attempting to push the apartment door in; that the police were also summoned by a telephone conversation from * * * [the babysitter] at 1:40 A.M. * * * that the police arrived very shortly after 1:30 A.M. * * * that two officers first came to the apartment and that in excess of two more joined them later after the 1:40 A.M. call; that they identified themselves to the besieged and the besiegers; that they gave no direction to anyone; that they did not *451 participate in the assault or seizure; * * * that the police announced themselves to the occupants of the apartment but did not in any way demand entry under the authority of their office."
After the police arrived it was discovered that the door was jammed and could not be opened from either side. Eventually, at about 2 A.M., a cooperative effort resulted in opening the door. In response to the occupant's invitation, two police officers entered the apartment; they were followed by DeLorenzo and his cameraman, who were uninvited. The Chancery judge found that both defendant and the paramour objected to the taking of photographs in the apartment, and that, besides the photographs, "no additional evidence was secured." Plaintiff's counsel has supplied the court with four photographs, and has stipulated that "No other evidence was taken from or in the apartment by the investigators, or anyone else * * *."
One picture shows the paramour's head and left shoulder as she is apparently speaking to someone in the hallway from behind her partially open apartment door. Two show the paramour in her son's bedroom; in one she is sitting on his bed talking to the boy, in the other she is standing looking over her left shoulder toward the boy. The last photograph is one of defendant and two police officers who entered the apartment. In each picture the parties are fully clothed and well-groomed; defendant is wearing a tie and business suit; the girl friend appears to be in a dark dress with lace trim, wearing high-heeled shoes and jewelry.
The trial court suppressed these photographs and the various papers found in the office files.

THE "RAID"
The opinion of the Chancery Division stated the question to be whether Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), "applies to civil as well as criminal cases." 92 N.J. Super., at p. 305. That is not, however, the critical issue. It could be assumed that Mapp *452 applies to civil litigation, but here the central question remains whether plaintiff, acting alone or through nongovernmental agents, violated any rights protected by the Fourth Amendment. The trial judge recognized the problem when he said:
"The fiat upon which it is sought to limit the impact of Mapp to governmental seizures only and not to evidence illegally gathered by private persons is the holding in Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), that the Fourth Amendment is not involved in nongovernmental intrusions." 92 N.J. Super., at p. 306.
But he concluded that One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), in effect overruled Burdeau, citing Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), and Williams v. United States, 282 F.2d 940 (6 Cir. 1960). His opinion does not consider the problem of standing; it assumes, without giving reasons, that Mapp should govern a matrimonial action if Burdeau does not control; and it fails to explicate the standards by which it adjudged the searches as unreasonable.
Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, 751 (1886), makes it clear that the Fourth Amendment was designed to apply "to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life." In Burdeau the court expanded on this concept:
"The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued." 256 U.S., at p. 475; 41 S.Ct., at p. 576, 65 L.Ed., at p. 1051.
*453 The United States Supreme Court has never specifically reconsidered that concept. The cases relied upon by the trial court do not support its conclusion that Burdeau has been overruled. In One 1958 Plymouth, the search was made by "two law enforcement officers of the Pennsylvania Liquor Control Board." 380 U.S., at p. 694; 85 S.Ct., at p. 1247; 14 L.Ed.2d, at p. 171. Elkins concerned evidence seized by state law enforcement officials. The Williams case stands only for the proposition that the "silver platter" doctrine, which Burdeau recognized, was overruled by Elkins. That, of course, is correct. Williams, however, does not hold that the Burdeau decision  that only the sovereign may violate the Fourth Amendment  was overturned by Elkins, for in Williams the search was made "by two police officers of the city of Knoxville, Tennessee." 282 F.2d, at p. 941.
We have found only one case holding, in accord with the trial court's opinion, that Burdeau no longer governs, viz., Williams v. Williams, 8 Ohio Misc. 156, 221 N.E.2d 622, 626 (C.P. 1966), ruling that evidence "illegally" secured by a husband against his wife, after a decree of divorce, and sought to be used on a motion for a new trial on grounds of newly discovered evidence, must, constitutionally, be excluded. But see Sackler v. Sackler, 15 N.Y.2d 40, 255 N.Y.S.2d 83, 203 N.E.2d 481 (Ct. App. 1964), wherein the court relies on Burdeau in holding proof as to defendant wife's adultery admissible in a divorce action even though secured by means of a raid into the wife's home by her husband and his hired agents. Every other case found, from 1960, the year of Elkins, to the present, has held, in accord with Burdeau, that the Fourth Amendment proscribes only unreasonable searches by the sovereign.[1]
*454 On the basis of the evidence presented at the remand hearings, and the findings of the trial judge, it seems clear that the police presence at the scene of the raid did not constitute sovereign participation in securing the photographic evidence. The private detectives did not act in "concert" with the police or as "an arm of the police" in securing the evidence. See State v. Scrotsky, 39 N.J. 410, 416 (1963); Lustig v. United States, 338 U.S. 74, 78-79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819, 1823 (1949); and Moody v. United States, supra, note 1, at p. 340.

THE BUSINESS FILES
The papers which were suppressed were found in one of the office file cabinets in a room to which plaintiff had complete access. They were left in files to which she had a full freedom of entry. Plaintiff was a participant in certain phases of the business and was part-owner and a resident of the premises. Some of her personal property was located *455 in the room. In these circumstances we question whether defendant has standing to challenge his wife's seizure of the papers. See generally, United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); State v. Wade, 89 N.J. Super. 139 (App. Div. 1965); Annotation, 78 A.L.R.2d 246 (1961).
The trial court made no definite findings as to how, when and where the papers were found beyond stating that plaintiff learned of their "general or specific location" as the result of eavesdropping on telephone conversations.[2] Plaintiff, however, gave the following uncontradicted testimony at the hearings on the remand:
"Q. What would generally be the occasions that would justify you in going to the files?
A. Lots of times I got a call from one of our people asking if we had their [cemetery plot] deed, and I would refer to the file, because in the folder my husband always specified whether the deed was returned to the family or not, and if it wasn't, then I would go into the other file, where we kept all the deeds * * *.

*456 * * * * * * * *
Q. Without stating what evidence you found, will you tell the Court how you obtained it?
A. Well, it was one of these occasions when I got the phone call, and I went into the file to refer to the folder. The person asked me about a deed, whether we had it, and when I went in this file, as I am thumbing through it, I found all this evidence.
Q. Where was it?
A. It was in between the files.
Q. Was it in a folder?
A. No, it wasn't. It was all loose in there."
Having a legitimate reason for being in the files, plaintiff had a right to seize evidence she believed indicated her husband was being unfaithful.

CONCLUSION
Circumstantial evidence may be relied upon in reaching a conclusion that adultery was committed where both inclination and opportunity were present. Eberhard v. Eberhard, 4 N.J. 535, 545 (1950). "The test is in the cogency of the circumstances. The proof must have sufficient probative force to support a legal inference as contrasted with a mere speculation." Ibid. See Berckmans v. Berckmans, 16 N.J. Eq. 122, 140 (Ch. 1863), affirmed 17 N.J. Eq. 453 (E. & A. 1864); Judkins v. Judkins, 22 N.J. Super. 516, 542-543 (Ch. Div. 1952); Luthner v. Luthner, 73 N.J. Super. 187, 191-192 (App. Div. 1962). The trial court may, after careful scrutiny, accept the testimony of hired detectives. Armour v. Armour, 138 N.J. Eq. 145, 149 (E. & A. 1946). Here the four photographs, obtained during the raid on the paramour's apartment, at most would constitute cumulative evidence. Even if unlawfully taken and if excludable under Mapp, their admission would add nothing to plaintiff's case nor would it prejudice defendant's case. It is difficult to perceive how the photographs in question could possibly lead the court to decide the issue of alleged adultery in plaintiff's favor. Cf. Chapman v. State of California, 386 *457 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 709 (1967).
In view of the type of evidence secured in the raid and the factual circumstances surrounding the seizure of the papers from the office files, we conclude that defendant's Fourth Amendment rights would not be infringed upon by the admission of the proffered evidence. The trial court in suppressing the evidence under consideration made two very broad assumptions: (a) that Burdeau had been overruled and the Fourth Amendment applies to nongovernmental searches and seizures, and (b) that the Fourth Amendment applies to searches and seizures in civil and criminal cases. In the circumstances here presented, aside from deciding the viability of the Burdeau doctrine, we do not reach any of the other constitutional questions raised on this appeal. We do not rule on them; they must be reserved until the facts of another case compel decision.
We reverse the decision of the Chancery Division ordering the items of evidence suppressed, and also its conclusion of law that the holding in Burdeau v. McDowell, supra, that only the sovereign may violate the Fourth Amendment, has been overruled.
Reversed and remanded for plenary trial.
NOTES
[1] The pertinent authorities are: United States v. Goldberg, 330 F.2d 30, 35 (3 Cir. 1964), certiorari denied 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964), specifically rejecting the argument that Elkins overruled Burdeau; Smayda v. United States, 352 F.2d 251 (9 Cir. 1965), concurring opinion of Pope, J., at p. 257, certiorari denied 382 U.S. 981, 86 S.Ct. 555, 15 L.Ed.2d 471 (1966); Corngold v. United States, 367 F.2d 1, 4 (9 Cir. 1966); Barnes v. United States, 373 F.2d 517, 518 (5 Cir. 1967); Geniviva v. Bingler, 206 F. Supp. 81, 83 (W.D. Pa. 1961), specifically considering the effect of Elkins and Mapp on Burdeau and holding that, "The rule, however, has not been expanded to the extent that evidence obtained by persons not acting in concert with either state or federal officials must be excluded"; Knoll Associates, Inc. v. Dixon, 232 F. Supp. 283, 286-287 (S.D.N.Y. 1964), action involving violation of the Clayton Act, Mapp and Elkins specifically considered and held not to require exclusion of corporate documents illegally removed from file by former employee; United States v. Masterson, 251 F. Supp. 937, 940 (S.D.N.Y. 1966), Elkins and Mapp considered and held not to have changed the rule in Burdeau; United States v. Stonehill, 254 F. Supp. 1003, 1004 (S.D.N.Y. 1966); State v. Robinson, 86 N.J. Super. 308, 315-318 (Law Div. 1965); Moody v. United States, 163 A.2d 337, 340 (D.C. Mun. Ct. App. 1960), Elkins does not modify Burdeau; Commonwealth v. Tanchyn, 200 Pa. Super. 148, 188 A.2d 824, 826-827 (Super. Ct. 1963), certiorari denied 375 U.S. 866, 84 S.Ct. 138, 11 L.Ed.2d 92 (1963), Mapp held to work no change on the rule in Burdeau; Commonwealth ex rel. Wilkes v. Maroney, 423 Pa. 113, 222 A.2d 856, 859-860 (Sup. Ct. 1966); Wright v. United States, 224 A.2d 475, 476 (D.C. Ct. App. 1966), Elkins and Mapp "do not overrule the holding of Burdeau" that the Fourth Amendment protections apply only to governmental authorities and not "to the independent undertakings of private citizens," citing People v. Randazzo, 220 Cal. App.2d 768, 34 Cal. Rptr. 65 (Dist. Ct. App. 1963), certiorari denied 377 U.S. 1000, 84 S.Ct. 1933, 12 L.Ed.2d 1050 (1964). Note, Annotation, 50 A.L.R.2d 531, 571 (1956) and A.L.R.2d Later Case Service 100, 106-107 (1965). See also, Irvine v. People of State of California, 347 U.S. 128, 136, 74 S.Ct. 381, 385, 98 L.Ed. 561, 571 (1954), and cases there cited for the proposition that, "Private detectives may use methods to obtain evidence not open to officers of the law."
[2] We do not consider whether the statement in Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 454 (1963), that "the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of `papers and effects'" applies to the overheard telephone conversations. See Silverman v. United States, 365 U.S. 505, 509-512, 81 S.Ct. 679, 681-683, 5 L.Ed.2d 734, 738-739 (1961). The opinion of the trial court did not refer to the problem and it was not argued in the briefs of counsel. See R.R. 1:7-1, 2:7-1. Furthermore, we are of the opinion that plaintiff's listening in on an extension telephone in her own home would not constitute a sufficient invasion of privacy for us to consider the full range of the constitutional issues.