282 N.J. Super. 538 (1995)
660 A.2d 1221
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DONALD BROWN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted June 1, 1995.
Decided July 10, 1995.
*541 Before Judges SHEBELL, SKILLMAN and KLEINER.
Susan L. Reisner, Public Defender, attorney for appellant (Lowell Espey, Designated Counsel, of counsel and on the brief).
Clifford J. Minor, Essex County Prosecutor, attorney for respondent (Raymond W. Hoffman, Assistant Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by KLEINER, J.A.D.
Donald Brown was indicted for purposeful or knowing murder by his own conduct, contrary to N.J.S.A. 2C:11-3a(1) and (2) and other crimes. Tried to a jury as a capital case, defendant was convicted of non-capital murder, contrary to N.J.S.A. 2C:11-3a(1) (count one); theft, as a lesser-included offense of third degree robbery, contrary to N.J.S.A. 2C:15-1 (count three); possession of weapons under circumstances not manifestly appropriate for their lawful use, contrary to N.J.S.A. 2C:39-5(d) (count four); and possession of weapons with the purpose of using them unlawfully against another person, contrary to N.J.S.A. 2C:39-4(d) (count five). Defendant was acquitted of felony murder, count two, and robbery, count three. Defendant was thereafter sentenced on count one to a custodial term of fifty years with a thirty year period of parole ineligibility and a concurrent term of six months on count three. Counts four and five merged with the conviction on count one. An appropriate penalty payable to the Violent Crimes Compensation Board was imposed.
On appeal, defendant raises three points of error:
POINT I
THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS SINCE DEFENDANT HAD A REASONABLE PRIVACY EXPECTATION IN THE SEARCHED PREMISES AND THE STATE FAILED TO ESTABLISH THAT A VALID CONSENT WAS GIVEN TO SEARCH THE BASEMENT ROOM OF THE APARTMENT BUILDING.

*542 POINT II

THE TRIAL COURT SHOULD HAVE EXCLUDED THE ORAL STATEMENTS BY DEFENDANT WHICH WERE THE PRODUCT OF CUSTODIAL FUNCTIONAL INTERROGATION AND ADDITIONAL IMPERMISSIBLE QUESTIONING, NOT PRECEDED BY MIRANDA WARNINGS, AS WELL AS HIS SUBSEQUENTLY OBTAINED WRITTEN STATEMENT, WHICH RESULTED FROM A SINGLE CONTINUOUS INTERROGATION EVENT AND WAS OBTAINED BY THE IMPROPERLY OBTAINED ORAL ADMISSIONS.
A. THE TRIAL COURT IMPROPERLY ADMITTED DEFENDANT'S ORAL STATEMENTS WHICH RESULTED FROM IMPERMISSIBLE UNMIRANDIZED CUSTODIAL FUNCTIONAL INTERROGATION AND ADDITIONAL UNMIRANDIZED DIRECT QUESTIONING.
B. THE TRIAL COURT IMPROPERLY ADMITTED DEFENDANT'S WRITTEN CONFESSION WHICH WAS THE PRODUCT OF A SINGLE CONTINUOUS INTERROGATION EVENT AND WAS TAINTED BY THE EARLIER IMPROPERLY OBTAINED UNMIRANDIZED ADMISSIONS.
POINT III
DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIEW OF THE FUNDAMENTAL DIFFERENCES BETWEEN DEFENDANT AND HIS TRIAL ATTORNEYS (PARTIALLY RAISED BELOW).
We affirm.
On the morning of September 26, 1988, Fannie Hilton, age 80, who lived alone in a third floor apartment in the Orange Towers Apartment Building in Orange, New Jersey, was found by her adult daughter, Sylvia Hilton, lying on the floor in her apartment. She was bleeding and unconscious, her hands and feet were bound, and her nightgown and bathrobe were pushed up, exposing her buttocks. A hall rug was placed over her head. Bloodstained scissors were next to her body. When the victim's body was turned over, police found a brown-handled knife sticking out of her abdomen.
The victim's daughter lived in a basement apartment in the same building. She had telephoned her mother at 8:15 a.m. and talked with her briefly. At 9:00 a.m., Sylvia attempted to call her mother again, without success. Sylvia attempted another call at 9:10 a.m. When her mother again failed to answer the telephone, Sylvia went to her mother's apartment. Sylvia found the apartment unlocked, although it was her mother's habit to keep a deadbolt lock, a doorknob lock and a chain engaged while she was at home alone. On entering her mother's apartment and discovering *543 her body, she immediately telephoned 911 and her mother's physician. On inspection, Sylvia found the apartment in disarray. Drawers were open, dining room chairs had been moved and a bathroom towel was found on one dining room chair. Her mother's body had been bound with scarves that had been removed from one drawer. Ten dollars had been removed from her mother's pocketbook.
Sylvia testified at trial that she saw defendant on the morning of the murder between eight and nine o'clock when she looked out her window, and thereafter near the elevator while en route to her mother's apartment. After she called 911, Sylvia went to the door of her mother's apartment. She observed defendant, who asked if he could be of help.
Detective William Combes arrived at the crime scene at 9:30 a.m. Combes learned from the building superintendent that defendant, the building porter, was the only other person who worked in the building. Combes spoke to defendant, and defendant agreed to accompany him to headquarters for routine questioning. At headquarters, Combes administered Miranda warnings,[1] and defendant acknowledged both orally and in writing that he understood his rights.
While Combes was at headquarters, the crime scene was further investigated by County Investigator James Gold. Gold learned from Sylvia Hilton of her mother's habit of keeping the door to her apartment locked. Gold concluded that the crime was probably committed by someone who had access to the building and who the victim knew. Sylvia Hilton advised Gold that she suspected defendant had committed the crime. Further inspection of the victim's apartment revealed what appeared to be sneaker footprints on both sides of the kitchen door. A portion of the apartment wall containing the footprints was removed for analysis.
*544 Gold learned from the superintendent that there was a locked room in the building's basement used to store recycling material. The room was known as the "porter's room." Only the superintendent, defendant, and one other employee had keys to that room. Gold asked the superintendent if he would permit an inspection of the room. The superintendent indicated he had no objection, and the porter's room was unlocked. Gold discovered that the room was used for storing bundled newspapers, old refrigerators, countertops, and other items intended for recycling. The room also had a couch. Gold observed a towel, similar to the towels in decedent's bathroom, on the couch. He also observed fibers on the towel. He confiscated the towel for analysis.
During the initial investigation, the police learned that Richard Praitano, a building resident, saw defendant in the garbage room in the basement at 7:50 a.m. Elizabeth Gallo, another resident, saw defendant in the parking lot at 8:30 a.m. The superintendent heard defendant pulling garbage from the garbage chute at 9:20 a.m. Defendant normally worked from 8:00 a.m. to 4:00 p.m. Defendant told the superintendent that he arrived at work at 9:00 a.m. that day, as he was delayed by family troubles at home. During the day defendant complained of pains in his chest, he appeared to be sick, and he was upset.
The investigation also revealed that the victim had a continuing dispute with defendant. One of defendant's responsibilities was to maintain the building, particularly the garbage room. The victim had been complaining to defendant and the superintendent that the building was unclean, and that she had observed roaches and mice in the garbage room. The superintendent brought the victim's complaints to defendant's attention. Defendant expressed his dislike for the victim to the superintendent.
On September 30, 1988, defendant was asked to visit police headquarters a second time. Gold later testified that at the second interview defendant was a suspect, as defendant had given inconsistent information respecting the time of his arrival at work *545 on the day of the murder, and as he was the only person known to be present in the building who was wearing sneakers on the day of the crime.
When defendant arrived for the second interview, he was advised by Gold that he was a suspect; however, he was not told of the basis for Gold's suspicion. Gold administered Miranda warnings and defendant acknowledged, both orally and in writing, that he understood his rights. Defendant gave a statement denying any involvement with the crime and indicated that he had not seen the victim on the day of the crime.
Defendant told Gold that he was then wearing the same shirt and sneakers that he had worn on the day of the crime, September 26, 1988. At Gold's request, defendant gave Gold the sneakers, his shirt and a hair sample. Defendant also returned to his apartment and turned over to Gold a pair of shorts that he had worn to work on the day of the crime.
On December 20, 1988, Gold received a report from the State Police laboratory. The sneaker print on the wall of the victim's apartment was consistent with defendant's sneaker. Fibers found on the victim were the same as fibers in the waistband of the defendant's shorts. Gold obtained an arrest warrant for defendant.
On December 21, 1988, Combes invited defendant to police headquarters, intending to arrest him upon his arrival. When defendant was told that he was under arrest, he asked Gold "why." Gold responded by spending forty-five minutes to one hour going over the evidence implicating defendant. He showed defendant photos of the footprint on the wall, laboratory reports, and pointed out inconsistencies in defendant's prior statement. He explained that the evidence found inside the victim's apartment could only have gotten there if defendant had been there. He told defendant that the footprint on the wall came from defendant's sneaker and that the fibers found on the victim came from the *546 shorts defendant had worn to work on the day of the crime.[2]
When Gold completed his review of the evidence, defendant asked to make a telephone call. When defendant completed his use of the phone, he looked at Gold and stated: "It was an accident." Gold asked: "What was an accident?" Defendant responded that he did not mean to kill the victim. Gold immediately advised defendant of his Miranda rights, and defendant signed a Miranda warning card. Defendant immediately recounted the events of September 26, 1988. The investigator then proceeded to take a formal written statement, which defendant signed.

I
Prior to defendant's trial, he moved to suppress the search of the porter's room in Orange Towers and the seizure of the towel, which was found on the couch in that room. Defendant predicated this motion on two grounds: (1) the search of the porter's room invaded defendant's legitimate expectation of privacy in that room; and (2) the building superintendent did not validly consent to a search of that room, as he had not been informed that he had a right to refuse the police inspection.
The trial judge rejected both of those arguments. He correctly concluded that any expectation of privacy was minimal, in that three building employees had keys to that room, and the room's main use was a general work and storage area for the entire apartment building. Additionally, the towel was found on a couch in plain view. State v. Bruzzese, 94 N.J. 210, 238, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). The trial judge also correctly concluded that the superintendent had voluntarily consented to the police search of the porter's room.
*547 We begin our analysis with the recognition that one seeking to invoke the protection of the Fourth Amendment must establish that a reasonable expectation of privacy was invaded by government action. State v. Marshall, 123 N.J. 1, 66, 586 A.2d 85 (1991). "Expectations of privacy are established by general social norms." State v. Hempele, 120 N.J. 182, 200, 576 A.2d 793 (1990) (citing Robbins v. California, 453 U.S. 420, 428, 101 S.Ct. 2841, 2847, 69 L.Ed.2d 744, 751 (1981) (plurality opinion), overruled on other grounds, United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). From an objective viewpoint, a worker sharing locked work space cannot reasonably have an expectation of privacy where other workmen have access to the same work space. For example, a tenant does not have a reasonable expectation of privacy in the common areas of a building merely because doors to the common areas are normally kept locked and require a key for access. United States v. Concepcion, 942 F.2d 1170, 1171-72 (7th Cir.1991).
By viewing an expectation of privacy from societal norms, we reject any test predicated upon a subjective analysis. State v. Hempele, supra, 120 N.J. at 198-99, 576 A.2d 793. One with an expectation of privacy would not openly leave a personal possession that he wished to remain private on a couch in a room to which others have access. Defendant's subjective belief that the porter's room was private was irrelevant.
Having concluded that defendant had no expectation of privacy in the porter's room, we are not required to consider defendant's second argument; however, in the interest of a complete analysis, we reject defendant's contention and conclude, as did the trial judge, that the superintendent had the authority to permit police access to the porter's room. His consent to that inspection was not affected by the failure of the police to specifically inform him that he had the right to refuse the inspection. State v. Johnson, 68 N.J. 349, 353-54, 346 A.2d 66 (1975). "[W]here the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was *548 voluntary, an essential element of which is knowledge of the right to refuse consent." Ibid. Furthermore, "if the State seeks to rely on consent as the basis for a search, it has the burden of demonstrating knowledge on the part of the person involved that he had a choice in the matter." Id. at 354, 346 A.2d 66. Consent to a search may be express or implied. State v. Koedatich, 112 N.J. 225, 262-64, 548 A.2d 939 (1988), cert. denied, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989).
In this case, the superintendent was extremely cooperative with the police in their investigation. There is not one indication in the record that the superintendent would have declined consent to the inspection had he been informed of that right. Additionally, we note that Gold asked the superintendent "if he would have a problem with allowing police access to the porter's room." The superintendent responded that there would not be a problem and proceeded to unlock the door. The words "would he have a problem" clearly implied that the superintendent was permitted to reject the request to inspect. State v. Johnson does not compel the police to specifically advise the property owner of the affirmative right to refuse an inspection. Viewing the cooperative attitude of the superintendent and the totality of the circumstances, there is no evidence that the police were acting other than in a routine manner, as in Koedatich, supra, 112 N.J. at 264, 548 A.2d 939. See also State v. Boud, 240 N.J. Super. 171, 178-80, 572 A.2d 1182 (App.Div. 1990); State v. Ellis, 246 N.J. Super. 72, 77, 586 A.2d 876 (Law Div. 1990), aff'd sub nom. State v. Kelley, 271 N.J. Super. 44, 637 A.2d 1290 (App.Div.), certif. denied sub nom State v. Ellis, 137 N.J. 167, 644 A.2d 615 (1994).
We reject defendant's argument. The search of the porter's room and the seizure of the towel were proper. Defendant's motion to suppress was correctly decided.

II
Prior to trial, defendant also moved to suppress both the oral statement he gave to the police immediately after he was advised *549 that he was under arrest and the written statement that he signed after his oral statement. The trial judge refused to suppress either statement. We conclude the written statement was properly admitted. Consequently, the failure to suppress the oral statement was harmless error.

ORAL STATEMENT
The crux of defendant's argument is that his oral statement, that "it was an accident" and he had not meant to kill the victim, made without Miranda warnings after listening to Investigator Gold enumerate the various pieces of evidence which either directly or circumstantially implicated defendant, was an involuntary statement given after the functional equivalent of an interrogation. State v. Ward, 240 N.J. Super. 412, 419, 573 A.2d 505 (App.Div. 1990).[3] As in Ward, we conclude that defendant's oral statement was "not simply a spontaneous outburst elicited casually or innocently without the State's purposeful enticement or encouragement." Id. at 417, 573 A.2d 505.
We concluded in Ward that the test is "whether `a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response.'" Ibid. (quoting Rhode Island v. Innis, 446 U.S. 291, 303, 100 S.Ct. 1682, 1691, 64 L.Ed.2d 297, 309 (1980)). Miranda safeguards come into play whenever someone is subject either to express questioning "or its functional equivalent." Innis, supra, 446 U.S. at 300-02, 100 S.Ct. at 1689-90, 64 L.Ed.2d at 307-08.
*550 The term "interrogation" does not only refer to express questioning but also to any words or actions by the police that they should know are "reasonably likely to evoke an incriminating response" from a suspect. Ibid. The Ward court held that the detective undertook to elicit a response helpful to the investigation and incriminatory of the defendant. "Defendant should have been given the Miranda warnings before, not after, the Detective started the process so clearly designed to entangle the defendant in the criminal event." State v. Ward, supra, 240 N.J. Super. at 418, 573 A.2d 505. The procedure in Ward did not scrupulously honor defendant's rights. Such scrupulous respect "would have required giving him the warnings right away, before the Detective embarked on his accusatory task." Id. at 419, 573 A.2d 505.
The only distinction the State makes with Ward is that, unlike the officer in Ward, Gold confronted defendant with evidence of his guilt only after defendant said that he wanted to know "why" he was being charged. The State contends that defendant let it be known "that he was interested in learning" about the evidence. We disagree. Defendant did not ask about the evidence of his guilt. Rather, Gold testified as follows:
Q What occurred after you advised Mr. Brown that he was under arrest?
A He asked me why and I told him why.
A detailed, forty-five minute to one hour explanation of all of the evidence was certainly more than was required by defendant's question. Moreover, it is apparent that Gold was already prepared to give such an explanation, no matter what defendant said. Gold's response was long, detailed and apparently well-prepared. His analytical and accusatory iteration was clearly designed to invoke some response from defendant. Gold knew or should have known that defendant was likely to respond in some manner to the evidence presented. As such, we conclude that Gold's tactics were more egregious than the police action described in Ward. The itemization of the evidence should have been preceded by Miranda warnings.

*551 WRITTEN STATEMENT
Although we conclude that defendant's oral statement should have been excluded, we are bound by Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), to conclude that defendant's written statement was admissible in evidence. The written statement was given after appropriate Miranda warnings and defendant's acknowledgement that he understood those warnings and his voluntary waiver of his rights. The Supreme Court has held:
If errors are made by law enforcement officers in administering the prophylactic Miranda procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.
[Id., 470 U.S. at 309, 105 S.Ct. at 1293, 84 L.Ed.2d at 232.]
Arguably, our conclusion that Gold's itemization of the accumulated evidence, the functional equivalent of interrogation which should have occurred only after the administration of Miranda warnings, should lead to the conclusion that Gold's action constituted "actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," as discussed in Elstad, supra. However, that conclusion would disregard the additional discussion in Elstad: "There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and ... disclosure ... freely given in response to an unwarned but noncoercive question...." Id., 470 U.S. at 312, 105 S.Ct. at 1295, 84 L.Ed.2d at 234.
In Elstad, the police came to arrest defendant, just as the police here intended to do with defendant Brown. In both cases, the police believed defendant had committed a crime. In Elstad, they asked questions; in this case, they presented the evidence against *552 defendant. In each case, the police created an interrogative environment which induced the defendant to give a voluntary, inculpatory statement. But in neither case did the police threaten, use physical violence, make promises, deprive defendant of food, lie, or use any other means to intimidate defendant. Neither "interrogation" lasted an inordinately long time, although defendant's lasted up to an hour.
While it is clear that the exposition of this evidence against defendant was intended to convince him to confess, it is not clear that Gold intended to "undermine the suspect's ability to exercise his free will." Id., 470 U.S. at 309, 105 S.Ct. at 1293, 84 L.Ed.2d at 232. The police had given Miranda warnings at the time of defendant's two earlier interviews, and Gold immediately gave Miranda warnings before defendant orally provided details of the crime and gave his written statement. Gold did not ask defendant any questions when defendant arrived at police headquarters, nor did Gold ask any questions when he completed his review of the evidence. It is likely Gold hoped that the itemization of the evidence would lead to a written confession, preceded by Miranda warnings. As actually occurred, however, defendant gave an unexpected inculpatory remark before Miranda warnings could be administered. Although Gold's methodology was the equivalent of interrogation which required Miranda warnings, we cannot conclude that the methodology offended the dictates of Elstad, supra.
Defendant contends that Elstad has been limited in its scope in New Jersey by State v. Hartley, 103 N.J. 252, 511 A.2d 80 (1986). We disagree. Hartley did not limit Elstad, but distinguished it. In Hartley, defendant was arrested by FBI agents, Atlantic City police officers and prosecutors, and New York City police officers. Id. at 257, 511 A.2d 80. An FBI agent read Miranda warnings immediately, and the warnings were read again after defendant arrived at the FBI office in New York. Id. at 257-58, 511 A.2d 80. The defendant clearly said that he did not want to make a statement. The authorities stopped questioning him. Ibid.
*553 Later that morning, an FBI agent returned to Hartley and asked him to reconsider, saying: "[N]ow is the time if you are going to make a statement." Id. at 258, 511 A.2d 80. Defendant replied: "What do you want to know?" Id. at 259, 511 A.2d 80. Without readministering Miranda warnings, the agent proceeded to ask defendant questions about the crime, and defendant gave a full confession. Ibid. Shortly thereafter, defendant was questioned by the New York and New Jersey officials, and he gave them a statement, as well. However, he refused to sign either statement. Id. at 259, 511 A.2d 80.
The New Jersey Supreme Court held that when a person has invoked Miranda rights, it is essential that police readminister the rights before resuming custodial interrogation. Id. at 267, 511 A.2d 80. Since the officials had not done that, the first statement, given to the FBI, was inadmissible. Id. at 268, 511 A.2d 80.
The court distinguished Elstad, noting that the U.S. Supreme Court had held that a violation of the requirement that police give Miranda warnings was not a violation of constitutional dimension; it was only a violation of Miranda's prophylactic, procedural requirements. Id. at 274-75, 511 A.2d 80. If someone has "once responded to unwarned yet uncoercive questioning," then that person is "not thereby disabled from waiving his [or her] rights and confessing after [receiving] the requisite warnings." Id. at 276, 511 A.2d 80 (quoting Elstad, supra, 470 U.S. at 318, 105 S.Ct. at 1298, 84 L.Ed.2d at 238). But if someone has been warned and has chosen to remain silent (as Hartley had done), then the failure to scrupulously honor that decision constitutes a constitutional violation. Id. at 277, 511 A.2d 80. "[T]he failure to honor a previously-invoked right to silence smacks so inherently of compulsion that any statement following that failure is involuntary by definition." Id. at 278, 511 A.2d 80. The first statement given by Hartley to the FBI agents was inadmissible because it violated defendant's constitutional right to remain silent after he had invoked that right. Ibid. Unlike Elstad, it was not excluded *554 because of a violation of a mere prophylactic rule, the obligation to give Miranda warnings.
Defendant Brown did not invoke his right to silence, nor did police fail to scrupulously honor any invoked right. Nevertheless, defendant invokes a part of Hartley that is relevant only if a constitutional violation has occurred. Defendant examines the impact of the first statement on the second and says that, just as in Hartley, the written statement he gave was an integral part of the process by which the oral statement was given. Since the oral statement was taken improperly, the written statement was so tainted that it, too, should not have been admitted.
However, the relationship between the first and second statements is not an issue here as it was in Hartley. The Hartley Court examined that issue because it identified a constitutional violation in the taking of the first statement. The Court had to determine whether the second statement was tainted by violation inherent in the first. Had it concluded that Hartley was like Elstad, the Court would not have needed to make that inquiry, because there would have been no constitutional violation to taint the second confession.
The Hartley Court concluded that the second statement was tainted by the first because the second interrogation occurred in the same room as the first, and the two interrogations overlapped. "[A]t the very least the second interview followed so closely on the heels of the first as to be part and parcel of it, and hence to be burdened with the same constitutional infirmities." Id. at 280, 511 A.2d 80.
But even if the Court had treated the two interviews as separate, it would have reached the same result if the second statement was the "fruit of the poisonous tree." Id. at 281-82, 511 A.2d 80. To determine that, one would need to look at the time between confessions, any intervening circumstances, any change in place, whether defendant had an adequate warning of rights, whether he initiated the second confession, the effect of the first confession, and the purpose of police misconduct. Id. at 283, 511 *555 A.2d 80. The Hartley Court decided that under that test, the second statement was unavoidably tainted and thus inadmissible. Id. at 284, 511 A.2d 80.
The difference between Elstad and Hartley then, is as follows. Elstad excluded the first statement because defendant had not been warned of his Miranda rights. In Hartley, defendant was warned and invoked his right to silence, but that right was not scrupulously honored. That was not a procedural violation; it was a constitutional violation. Only if there was a procedural violation would it be necessary to determine whether the second statement was the fruit of a constitutional deprivation.
The present case is an Elstad case, not a Hartley case. Defendant was not warned of his Miranda rights before he gave his oral statement. He did not invoke any constitutional right, nor was his invocation ignored. Therefore, a Hartley analysis is not necessary because the second statement could not be the fruit of a constitutional violation.
We therefore conclude that although it was error to admit the oral statement as we have discussed supra, it was proper for the trial court to refuse to suppress defendant's written statement.

III
In defendant's third point of error, he contends that he was ineffectively assisted by counsel. The test for proving ineffective assistance of counsel is articulated in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984), as adopted in State v. Fritz, 105 N.J. 42, 52, 519 A.2d 336 (1987):
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown of the adversary process that renders the result unreliable.
[Ibid.]
*556 There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." Strickland v. Washington, supra, 466 U.S. at 688-89, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Moreover, even where ineffectiveness is shown, prejudice must also be proved; it is not to be presumed. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.
Defendant's brief on appeal cites several instances in which defendant expressed his dissatisfaction with his attorney to the trial judge and his disagreement with advice offered by his attorney. Although defendant was dissatisfied with his attorney, his general dissatisfaction cannot serve as a predicate for the conclusion that defendant was deprived of effective assistance. Defendant cannot point to one instance in which his disagreements with his attorney affected his representation of defendant.
Defendant also argues that his counsel's summation is demonstrative of ineffectiveness of counsel, which necessitates a grant of a new trial. We disagree but choose to elaborate on defendant's contentions.
Defendant, against the advice of his counsel, elected to testify in his own behalf. In his testimony, defendant denied committing the offense and contended that his oral and written statements were given under duress.
In defendant's oral and written statements, defendant indicated that on the morning of the crime, he had engaged in a conversation with the victim, who again complained to him of the insufficiencies in his cleaning of the garbage room. Defendant admitted that he became very upset and angered by the victim's constant complaining, that he lost control, and that he killed the victim. Defendant's counsel utilized the facts contained in defendant's oral and written statements in an effort to reduce the verdict to a *557 lesser-included offense of capital murder. Once defendant testified and entirely denied the offense, he created a dilemma for his counsel.
In summation, defendant's attorney reviewed defendant's testimony and strenuously argued to the jury that defendant's trial testimony was believable, and if believed by the jury, the jury was required to acquit defendant. Alternatively, counsel argued that if the jury did not believe defendant, then the oral and written statements demonstrated that defendant had not intended to kill the victim and that defendant's response was provoked by his reaction to the victim's criticism. It is clear that counsel made a tactical decision to argue defendant's own theory of non-culpability, and then to alternatively present an argument for a lesser-included offense.
The general test when considering effective assistance of counsel is whether counsel's performance was "reasonable considering all the circumstances." Strickland v. Washington, supra, 466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. "If counsel thoroughly investigates law and facts, considering all possible options, his or her trial strategy is `virtually unchallengeable.'" State v. Savage, 120 N.J. 594, 617, 577 A.2d 455 (1990) (citing Strickland v. Washington, supra, 466 U.S. at 690-91, 104 S.Ct. at 2065-66, 80 L.Ed.2d at 695). In Savage, the Court held that defense counsel's strategy was not preceded by a thorough investigation and consideration of all plausible options. State v. Savage, supra, 120 N.J. at 618, 577 A.2d 455. But that is not the case here. Defense counsel was thoroughly familiar with all of the evidence admitted at trial and made a decision to present both options to the jury.
State v. Buonadonna, 122 N.J. 22, 41, 583 A.2d 747 (1991) (quoting Strickland v. Washington, supra, 466 U.S. at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692-93), noted that "the benchmark for determining attorney incompetency is `whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" Ibid. Counsel's decision to present alternative arguments *558 in summation was entirely consistent with the evidence before the jury.
There was a great deal of evidence, in addition to defendant's statement, connecting him with the crime, and it was legitimate for counsel to believe that the best he could do for his client was to convince the jury that the crime was not first degree murder. Had counsel not done so, he would have been open to a charge of ineffective assistance for that reason. The result of the trial is reliable, and counsel's summation does not put that reliability in doubt. Defendant was not deprived of effective assistance of counsel.
The judgment of conviction is affirmed.
SHEBELL, P.J.A.D., concurring.
Although I agree with the majority's conclusion that defendant's convictions must be affirmed, I do not subscribe to their conclusion that defendant's oral statement should have been suppressed, as "an involuntary statement given after the functional equivalent of an interrogation." If indeed that was a reasonable conclusion to be made on the facts of this case, it was not one for this court to decide. Rather it was for the trial judge to determine. In any event, it appears that the conclusion of the majority is not on firm footing.
Defendant had on previous occasions given statements to the police concerning this homicide after being properly advised of his Miranda rights. It was the defendant who initiated the conversation on December 21, 1988, when he asked the investigator why he was being placed under arrest. The investigator did not interrogate the defendant. He spent considerable time going over the evidence implicating the defendant at defendant's request.
Defendant made no statements during the inspector's explanation of the evidence against him. It was only after the defendant exercised his right to make a phone call, and had completed the phone call, when without any action on the part of the investigator, *559 defendant turned to the investigator and made the statement: "It was an accident." The investigator before interrogating the defendant, advised defendant of his Miranda rights and had defendant sign a waiver of those rights.
We stated in Ward that "[t]he test ... is whether `a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response.'" State v. Ward, 240 N.J. Super. 412, 417, 573 A.2d 505 (App.Div. 1990) (quoting Rhode Island v. Innis, 446 U.S. 291, 303, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980); see also State v. Bey, 112 N.J. 45, 548 A.2d 846 (1988). Significantly, we noted in Ward, that "[w]e do not intend our ruling here to preclude the admission into evidence of any statement that is voluntarily blurted out by an accused in custody where the police have not subjected him to an interrogative technique or where the police are about to begin giving the Miranda warnings." 240 N.J. Super. at 419, 573 A.2d 505; see State v. Mallozzi, 246 N.J. Super. 509, 588 A.2d 389 (App.Div.), certif. denied, 126 N.J. 331, 598 A.2d 889 (1991).
On the record before this court, it appears more likely that defendant blurted out "[i]t was an accident," because of what transpired during his telephone conversation than as a result of the recounting to him of the evidence against him, as he remained silent during that entire explanation.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] At the suppression hearing and at trial, Gold acknowledged that the footprint and fiber evidence was not absolutely conclusive; however, Gold indicated he was not aware of that fact at the time of this meeting with defendant.
[3] The concept of the functional equivalent of interrogation in pre-Miranda custodial interrogation has rarely been discussed. Our research reveals only one other New Jersey decision, State v. Hall. State v. Hall, 253 N.J. Super. 84, 89-91, 600 A.2d 1248 (Law Div. 1990), aff'd, 253 N.J. Super. 32, 600 A.2d 1221 (App.Div. 1991) (question "Do you have anything on you?" during an on-scene pat-down search in the presence of seven other police officers constituted a custodial interrogation which required Miranda warnings).