**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2068-19T1

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

SAMUEL GUILLAUME,

    Defendant-Respondent.

_____

Argued September 21, 2020 – Decided October 28, 2020

Before Judges Rothstadt, Mayer and Susswein.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 18-02-0314.

Patrick F. Galdieri, II, Assistant Prosecutor, argued the cause for appellant (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Patrick F. Galdieri, II, of counsel and on the brief).

Melanie K. Dellplain, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Melanie K. Dellplain, of counsel and on the brief).

PER CURIAM

By leave granted, the State appeals from the trial court's October 17, 2019 order suppressing physical evidence and dismissing one count of the indictment charging defendant Samuel Guillaume with second-degree possession of materials used to falsify a government document. N.J.S.A. 2C:21-2.1(b). The trial court granted defendant's motion after it concluded that the consent to enter an apartment building given to the police by the building's superintendent, who also lived at the premises, was not valid because the superintendent conferred with his employer before allowing the police to enter the building.

On appeal, the State contends that the consent was valid regardless of the superintendent's consultation with his employer. We reverse as we conclude the police received valid consent before entering the building and arresting defendant in one of its common area hallways.

The material facts developed at the suppression hearing are not disputed. They are derived from the trial court's findings after considering the testimony of the only two witnesses who testified: Kevin Natal, a maintenance manager and five-year resident of the subject apartment complex, and Detective Louis A. Reyes, of the Carteret Police Department.

A-2068-19T1

Police arrested defendant and seized the suppressed evidence in the second-floor hallway of an apartment complex that consisted of a five-story building with approximately four hundred separate apartments. Defendant's arrest was the result of the local police assisting the New York City Police Department (NYPD), which sought to execute an outstanding warrant for defendant's arrest.

Prior to the arrest and seizure, in January 2016, Detective Al Torres of the Fugitive Unit for the NYPD approached Natal outside the building and asked if he recognized defendant from a picture Torres showed him. Natal recognized and identified defendant as the person who had been staying in the apartment of a woman who lived in the building on the second floor—about twenty-five feet from where Natal and his family resided. Though he had only seen him a few times, Natal said that defendant was the woman's boyfriend.

When Torres also showed Natal pictures of three luxury cars with Florida license plates that police suspected defendant of having stolen, Natal said he had, on occasion, seen those cars parked in the lot on the side of the building. Torres told Natal that defendant was wanted in connection with a shooting which made Natal concerned for the well-being of the other tenants—including his

A-2068-19T1

family. Torres gave Natal his phone number and told him to call if he saw defendant or any of the cars at the building.

After speaking to Torres, Natal advised his direct supervisor, the assistant property manager, about what he had learned regarding defendant. Natal told his supervisor he intended to call Torres if he saw defendant or his cars again, and she did not advise him not to do so.

On January 21, 2016, about a week after Torres had approached him, Natal saw one of the cars from the photographs parked near the building. Natal called Torres who then notified him that New York and Carteret police officers would soon be coming to arrest defendant. Natal testified that his decision to call Torres was "a hundred percent" voluntary.

The NYPD fugitive unit then reached out to the Carteret Police Department for help apprehending defendant. They informed the Carteret officers that there was an arrest warrant for defendant arising from attempted murder charges in New York.

According to Reyes, because of the nature of the charge against defendant, there was a "heightened sense" of danger associated with execution of the warrant as opposed to other situations in which Reyes had lent assistance in apprehending a fugitive. Reyes was not familiar with defendant, and the NYPD

A-2068-19T1

had made all arrangements with respect to verifying defendant's presence there. Reyes was familiar with Natal from previous calls for things such as first aid or false alarm fire calls. In Reyes's mind, "[t]here was no doubt" that Natal "represented the facility . . . in the capacity that he could grant us authority to enter."

After talking to Torres, Natal informed his supervisor he would be going to the Carteret police station and that the police would soon be coming to the building to apprehend defendant. The supervisor gave Natal permission to leave the building to go to the station and consented to his allowing the police to enter the building. When Natal arrived at the station, he explained to police that he had spoken to his supervisor and that "they had permission to go in."

Natal returned to the building, met the police outside, and confirmed again that his supervisor said they could enter the building. He then gave his key fobs to the police to allow them entry into the locked building through a side door. Natal explained that the side door opened to a stairwell that led to the second-floor hallway used by all of the building's tenants. The front door of the building, unlike the side door, was open to the public, but it opened only to the lobby and did not provide access to any of the common areas on the individual floors.

Natal's decision to let police into the building was not forced or coerced but was "completely voluntary, a hundred percent." However, the police never advised Natal he was free to refuse to allow them entry.

Using Natal's key fob, police entered through the side door of the building into the stairwell. According to Reyes, the police went through the side door rather than the main door for "tactical" reasons.

When the police reached the top of the second-floor landing, there was a door separating the stairwell from the common hallway around which there were multiple separate apartment units. After opening the door to the common area, police saw defendant in the second-floor hallway walking in their direction. At no point did police enter or see the inside of defendant's girlfriend's apartment.

The officers immediately arrested defendant and, upon searching defendant incident to his arrest, found a bag that defendant had been carrying containing five sheets of hologram stickers that appeared to resemble the seals for official New Jersey governmental documents along with other items.

After considering Natal's and Reyes's testimony and the oral arguments of counsel, on October 17, 2019, the trial court granted defendant's motion, placing its reasons on the record in an oral decision. The court observed that because the law enforcement officers' entry into the building to look for defendant's

6

person was a warrantless "search," the State bore the burden of establishing that an exception to the warrant requirement applied.

The court then determined that the consent exception did not apply because Natal "didn't make the call" regarding whether or not to let police into the building but had instead reached out to his supervisor to "make the call." Because Natal was "just the conduit for her decision" to allow the police to enter, the court reasoned, he had not actually consented to their entry. "[I]t was really the property manager who made this decision," and Natal had "passed the buck" to her because he was "afraid of . . . doing something wrong."

The court then held that Natal's supervisor, as the assistant property manager, fell "under the purview of landlord," and that landlords lacked "authority to allow . . . the police to search a . . . tenant's property." Because she was "an agent of the landlord," the assistant property manager could not lawfully consent to the police entering a private area. Although police only entered the common area of the second floor, and not anyone's apartment, the court found that area was private in the sense that it was closed off from the general public and the police only had access to it by using Natal's key fob to pass through a locked door. Significantly, the trial court stated that if Natal gave

7

consent "on his own or left [his supervisor] out of it I think [the consent] might have been all right."

Based on these findings, the court held that the apartment building's tenants had "a reasonable expectation" that neither "people from the street" nor the police would be "roaming the halls" and that expectation was entitled to constitutional protection under the Fourth Amendment. Because the officers' warrantless entry had upset that reasonable expectation, and because neither the consent exception nor any other exception to the warrant requirement applied, the court suppressed the holograms police had seized from defendant as the fruits of an illegal search and dismissed the first count of the indictment. This appeal followed.

Although, "[o]rdinarily, [our] review of a trial court's decision on a motion to suppress is limited," as deference is afforded to the court's factual findings, here, because "the facts underlying a suppression motion are uncontested," we exercise a de novo review affording "no deference to the judge's legal conclusions or interpretation of the legal consequences that flow from established facts." State v. Burns, 462 N.J. Super. 235, 243 (App. Div.), certif. denied, 241 N.J. 477 (2020); see also State v. Watts, 223 N.J. 503, 516 (2015).

A-2068-19T1

As the trial court correctly determined, the outcome of defendant's suppression motion turned on whether Natal's consent to enter the building was valid. Applying our de novo review of the trial court's legal determination, we disagree with its conclusion that the consent was not valid.

At the outset, we acknowledge that without such consent, the officers' entry into the building would have violated defendant's right to privacy.[1] "[T]he bedrock constitutional mandates of the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution . . . 'protect citizens against unreasonable police searches and seizures by requiring warrants issued upon probable cause.'" State v. Walker, 213 N.J. 281, 288–89 (2013) (quoting State v. Johnson, 171 N.J. 192, 205 (2002)). "The warrant requirement is strictly applied to physical entry into the home because the primary goal of the Fourth Amendment and Article I, Paragraph 7 of the state constitution is to protect individuals from unreasonable home intrusions." Id. at 289. That protection extends to the locked entryway of apartment buildings, "[e]ven when strangers have access to the location." State v. Sencion, 454 N.J. Super. 25, 32 (App. Div. 2018) (concluding a police officer's repeated forced

---

[1] It is undisputed that defendant was regularly staying with his girlfriend at the time of his arrest.

entry into a locked apartment building was unconstitutional), certif. denied, 236 N.J. 473 (2019).

As we observed in Sencion, "[p]olice [are] not privileged to enter [a] hallway [in a two family house] without a warrant or an exception to the warrant requirement" where "the common hallway . . . was not open to the public." Id. at 33 (citing State v. Jefferson, 413 N.J. Super. 344, 354 (App. Div. 2010)). For that reason, in Sencion, we held that under the New Jersey Constitution, where the police, on two separate occasions, used a "burglary tool" to forcibly enter an apartment building's locked entryway, "people have a reasonable expectation of privacy from a forced police entry into the locked common area of the apartment building." Id. at 29.

However, we also acknowledged that "[w]hen seeking to enter the locked entryway to an apartment building, many individuals might legitimately give an officer permission to enter, including any resident of the building or the superintendent." Id. at 35. But, while "[c]onsent to search is a 'long-recognized' exception to the warrant requirement," State v. Hagan, 233 N.J. 30, 39 (2018) (quoting State v. Coles, 218 N.J. 322, 337 (2014)), the exception is limited. If entry into a building is legally obtained through the consent of either a resident, superintendent or landlord, it extends only to the building's common areas. See

Johnson, 171 N.J. at 209; State v. Brown, 282 N.J. Super. 538, 547 (App. Div. 1995); United States v. Correa, 653 F.3d 187, 190–91 (3d Cir. 2011) (upholding an arrest and seizure under federal law, even when police entry is without permission, because "a resident lacks an objectively reasonable expectation of privacy in the common areas of a locked, multi-unit apartment building.").

Consent to enter an apartment building's common area does not necessarily extend to a resident's apartment. "[L]aw enforcement cannot accept a landlord's invitation to enter [inside] a home without a warrant unless an exception to the warrant requirement applies." State v. Wright, 221 N.J. 456, 478 (2015); see also State v. Shaw, 237 N.J. 588, 610 (2019) (addressing a hotel guest's reasonable expectation of privacy). "Absent exigency or some other exception to the warrant requirement, the police must get a warrant to enter a private home and conduct a search, even if a private actor [such as a landlord] has already searched the area and notified law enforcement." Wright, 221 N.J. at 476.

Manifestations of consent "may be express or implied." Brown, 282 N.J. Super. at 548, and "the State need not prove that the third person was informed of a right to refuse consent." State v. Douglas, 204 N.J. Super. 265, 277 (App. Div. 1985); see also State v. Farmer, 366 N.J. Super. 307, 313 (App. Div. 2004).

11

But the State bears "the burden of proving consent was given freely and voluntarily," State v. Lamb, 218 N.J. 300, 315 (2014), and of "demonstrating knowledge on the part of the person involved that he had a choice in the matter." State v. Miller, 159 N.J. Super. 552, 558 (App. Div. 1978). In each case, "[r]easonableness is the touchstone of the Fourth Amendment analysis." Lamb, 218 N.J. at 321.

Here, it was undisputed that Natal, a resident and superintendent, willingly cooperated with the police in their investigation and freely gave his consent to allowing the officers entry into the locked building. Defendant's argument to us that Natal's consent was insufficient because Natal was not advised that he could refuse to give the officers permission to enter the building is without any legal support. Here, "[t]here is not one indication in the record that the superintendent would have declined consent . . . had he been informed of that right." Brown, 282 N.J. Super. at 548 (affirming trial court's denial of defendant's suppression motion because police did not need a warrant to enter and search a locked utility room of an apartment building used by defendant after the superintendent consented to police officers' entry into the building and into the room).

Moreover, contrary to the trial court's conclusion, Natal's consent was not undermined by his calling his supervisor to seek her permission. First, assuming Natal had conditioned his consent on receiving his supervisor's permission to let the police in the building, once that condition was satisfied, he still had a choice in the matter—a fact he evidently understood by virtue of the very fact that he first wanted to check with the landlord before deciding the issue. Moreover, after the landlord consented to allowing the police to enter the building, even if Natal decided against allowing the officers access, the police had authority to enter the building from the landlord which officers could rely upon to the extent it gave them access to the common areas. Second, there was nothing about Natal's discussion with his supervisor that, as the trial court found, stripped his authority to allow the officers access.

In any event, again, there was no basis in the record to infer that Natal did not want to let the police inside the building. Indeed, his unchallenged testimony was that his decisions, first to call Torres and then to let the police in the building, were "a hundred percent" voluntary. As a resident and superintendent, Natal had actual and apparent authority to give the police access to the building's common areas as he had "common and joint use" of those areas, State v. Cushing, 226 N.J. 187, 202 (2016), and maintained an "appearance[] of control"

A-2068-19T1

over the premises. <u>Farmer</u>, 366 N.J. Super. at 313 (quoting <u>State v. Santana</u>, 215 N.J. Super. 63, 71 (App. Div. 1987)).

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2068-19T1